# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 56917-5-II |
| KEONTE AMIR SMITH, | |
| Petitioner. | UNPUBLISHED OPINION |

CRUSER, A.C.J. — Keonte Amir Smith was originally charged with several offenses, including second degree trafficking, in juvenile court. Smith was 17 years old at the time of his offenses. The juvenile court declined jurisdiction. Smith pleaded guilty in adult court to second degree trafficking and he was sentenced as an adult. The sentencing court declined Smith's request to impose an exceptional sentence downward and imposed a 111-month sentence, which was at the bottom of the standard sentencing range. In this timely personal restraint petition (PRP), Smith challenges the juvenile court's declination order and the sentencing court's refusal to impose an exceptional sentence downward.

We deny this PRP.

## BACKGROUND FACTS

The following background facts were set out in the direct appeal.

On November 24, 2016,[1] law enforcement received a complaint regarding an unwanted person in a motel room. Upon their arrival to the motel room, law

---

[1] November 24, 2016 was Smith's 17th birthday.

enforcement found Smith in the room with a handgun next to him.[2] Smith was arrested and placed in [juvenile] detention [in Remann Hall].

While Smith was in detention, law enforcement reviewed recorded detention phone calls between Smith and his girlfriend, HH. HH met Smith two months prior to Smith's arrest. In several of the phone calls, Smith and HH discussed prostitution and prostitution-related activities. During multiple phone conversations, HH spoke of "bringing money in" and told Smith about other males who wanted HH to work on their "team." Clerk's Papers (CP) at 186. Smith expressed frustration about HH pairing up with other males. Smith told HH that it was not "safe" to go on hotel dates while he was in detention and that if she needs help, to call his sister or a mutual friend. [CP at 186]. Smith directed HH to put money on his phone account in detention and warned her that she better not be "with someone else." [CP] at 187. At the time, HH was 16[3] years old and Smith was 17 years old.

After Smith's arrest, the defense interviewed HH. During the interview, HH stated that she and Smith jointly decided to engage in prostitution when they "decided to make money together." [CP] at 60. HH explained that Smith would help her set up dates and get hotel rooms. HH kept all the money and would not give any to Smith, although he often would steal some of the money for himself. HH also put some of the money she made on dates on Smith's phone account while he was in detention.

The State charged Smith with second degree trafficking, promoting commercial sexual abuse of a minor, and second degree unlawful possession of a firearm.

*State v. Smith*, No. 52323-0-II, slip op. at 1-2 (Wash. Ct. App. Aug. 25, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2052323-0-II%20Unpublished%20Opinion.pdf.

Also, while in detention, Smith threatened an ex-girlfriend over the phone and assaulted another detainee after throwing a cup of urine on him. He was subsequently charged with harassment and fourth degree assault.

---

[2] The probable cause statement states that when officers arrived at the motel room they "recovered a semi-automatic handgun that was next to the defendant." Response App. at 56.

[3] HH is referred to as 15 or 16 at various points in the record. The record is unclear about HH's age on specific dates, but we know that she likely turned 16 during the charging period.

On July 13, 2017, the State moved for the juvenile court to decline jurisdiction on the second degree trafficking, commercial sexual abuse of a minor, felony harassment, and fourth degree assault charges.[4] Smith opposed declination. Following a hearing, the juvenile court declined jurisdiction. Smith subsequently pleaded guilty in adult court to second degree trafficking.

At sentencing, Smith requested an exceptional sentence downward of 36 months in light of his youth. After hearing argument, the sentencing court declined this request and imposed a low-end standard range adult sentence of 111 months.

Smith appealed his sentence. In his appeal, he argued that the trial court abused its discretion by failing to fully consider his youth as a mitigating factor. *Smith*, No. 52323-0-II, slip op. at 1. "We h[e]ld that the trial court considered Smith's youth as a mitigating factor and acted within its discretion when it denied his request for an exceptional sentence downward and affirm[ed] his sentence." *Id.* Smith did not raise any issues regarding the juvenile court's declination order in his appeal.

Smith's direct appeal mandated on May 3, 2021. He filed this timely PRP on May 2, 2022. RCW 10.73.090(1), (3)(b).

Smith now challenges the juvenile court's declination order and the sentencing court's refusal to impose an exceptional sentence downward. Amici curiae Fred T. Korematsu Center for Law and Equality, Teamchild, and Washington Association of Criminal Defense Lawyers have filed a brief in support of this PRP.

---

[4] Smith also had another case pending on charges of second degree unlawful possession of a firearm and possession of marijuana stemming from his arrest at the motel, but those charges were not included in the State's declination motion.

PRP LEGAL PRINCIPLES

"Relief by way of a collateral challenge to a conviction is extraordinary, and the petitioner must meet a high standard before this court will disturb an otherwise settled judgment." *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). To obtain collateral relief through a PRP, the petitioner must demonstrate both error and prejudice. *Id.* If the claimed error is of constitutional magnitude, the petitioner must show actual and substantial prejudice. *Id.* If the claimed error is not of constitutional magnitude, the petitioner must demonstrate that the error is a fundamental defect that inherently resulted in a complete miscarriage of justice. *Id.*

Petitioners seeking relief through a PRP cannot merely renew an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013). Relitigation may serve the interests of justice if there has been an intervening change in the law or some other justification for having failed to raise a crucial point or argument in the appeal exists. *Id.* But petitioners cannot avoid this requirement "merely by supporting a previous ground for relief with different factual allegations or with different legal arguments." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004). The petitioner must instead "raise new points of fact and law that were not or could not have been raised in" the prior action. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388-89, 972 P.2d 1250 (1999).

DECLINATION ISSUES

Smith challenges the juvenile court's declination order. We hold that Smith fails to establish actual and substantial prejudice and dismiss these claims.

I.      ADDITIONAL FACTS

A.      TESTIMONY

The declination hearing was held on September 5 and 6, 2017.

1.      DETECTIVE NICHOLE FAIVRE

Detective Nicole Faivre testified about why Smith was in detention; HH's arrest; and the communications that led to Smith's second degree trafficking, commercial sex abuse of a minor, and harassment charges. Faivre also testified about the circumstances of Smith's arrest at the motel.

In addition, Faivre testified that after Smith's arrest but before HH's arrest, she (Faivre) was asked to listen to some recorded phone calls made from Remann Hall. Faivre concluded that the conversations between Smith and HH indicated that Smith and HH were working together and that he was acting as HH's pimp. When the State asked Faivre if, in her experience, most pimps are over 18 years old, she responded that she had only dealt with one other case involving someone who was under 18 acting as a pimp.

Faivre also testified about other calls between Smith and another person. During one of these calls, Smith threatened the other person, and she contacted the police.

2.    CODY JEWELL

Cody Jewell, who had been Smith's probation counselor at times, testified about Smith's criminal history, the sanctions he had received while in juvenile detention, whether he had completed his sanctions, and his family background.

Jewell testified that Smith's first contact with the juvenile system was in February 2012, when he was 13 years old. Smith was adjudicated for possessing a dangerous weapon on school grounds. He agreed to engage in a "diversion process" in which he was to participate in services, and he completed the contract. PRP App. B at 103.

Smith was then adjudicated guilty of trafficking in stolen property, obstructing a law enforcement officer, and first degree criminal trespass. Smith received a new referral on a forgery charge shortly after Jewell was assigned to the case. While Jewell was supervising Smith on this set of offenses, Smith entered and completed an in-house drug treatment program.

In July 2015, Smith was adjudicated guilty of unlawful possession of a firearm, which had originally been charged as first degree assault, and was again assigned to Jewell. Smith was sentenced to nine months of supervision for this offense.

During this nine-month supervision period, Smith was violated numerous times. He also failed to participate in several court ordered services. Smith was sanctioned with electronic home monitoring (EHM). He was subsequently charged with escape from EHM and served 28 days of secured confinement for that offense.

During this same period, Smith was also charged with attempting to elude a pursuing police vehicle and two instances of second degree driving while suspended or revoked. Smith was adjudicated guilty on one of the second degree driving while suspended charges and the eluding

charge in September 2016. Although Smith could have been committed to Juvenile Rehabilitation Administration (JRA), the juvenile equivalent of the Department of Corrections (DOC), for 15 to 36 weeks on the eluding charge, he received a suspended sentence to allow him to participate in services within the community. Smith failed to complete several of the conditions and services imposed.

During this time, Smith was also referred on a new charge for unlawful possession of a firearm based on the firearm discovered in the motel room. After the unlawful possession of a firearm charge, Smith was also charged with felony harassment, second degree trafficking, and fourth degree assault based on an assault that occurred while he was in detention.

Jewell testified that Smith had been offered all the services that juvenile probation could offer. Jewell stated that the longest Smith had been in custody before the current charges was 98 days and that Smith had never been sent to JRA.

Jewell also testified about Smith's education and his family life. He testified that Smith was currently 17 years old and that, other than attending school while in detention, the last time Smith attended school was in October 2015, when he was in tenth grade. Jewell testified that Smith was able to complete a forklift certification, but he was not receptive to other educational opportunities or programs.

Jewell stated that Smith predominately lived with his mother. Jewell stated that Smith's mother had a "significant drug abuse history" and that her drug use was possibly ongoing when she was supervising Smith. PRP App. B at 132. Smith's father had a criminal history that included domestic violence, second degree assault, and two weapons charges. At the time of the hearing,

7

Smith's father was in prison and was expected to be released in late 2018. Jewell was aware that Smith had witnessed domestic violence in the home at a young age.

Jewell also testified that Smith had witnessed his brother drown in American Lake in 2012. Jewell further testified that although Smith had done a mental health evaluation following his brother's drowning death, Jewell had never seen a diagnosis and Smith had never received mental health treatment.

3.    STEVE THOMAS

Steve Thomas, a detention supervisor at Remann Hall, testified about Smith's most recent admission to Remann Hall.

Thomas testified that Smith was admitted to Remann Hall on November 24, 2016, and that numerous incident reports had been issued since then. The incident reports started within three days of Smith being detained and continued, with some short breaks, until approximately five weeks before the declination hearing.

Although some of these incidents were minor, such as Smith having extra food and clothing in his room, he was also involved in fights, assaulting other youths, using intimidation to obtain food from other youths, refusing to cooperate with staff, refusing to cooperate with the school program, horseplay, and failing to "lock down" when required. *Id.* at 174. He was also reported to have been assaulted by another youth. His sanctions varied from being sent to his room to being placed on lockdown for up to three days.

On February 11, 2017, Smith assaulted another youth after throwing a cup of urine on him. This incident was recorded on video. As a result of this assault, the State charged Smith with fourth degree assault.

Thomas testified that Smith was written up for more incidents than was typical for youths in custody. When asked if Smith was a leader or follower, Thomas responded that Smith "would rather have somebody else lead, but he — with the absence of a strong person to manipulate, [he] would say, [Smith] becomes a leader." *Id*. at 179.

Thomas testified that although Smith had recently been able to achieve "privilege status,"[5] he did not believe that Smith had made significant changes in his behavior over the past several months. *Id.* at 187.

### 4. DEBBIE LYNE

Debbie Lyne, an administrator for the JRA, testified about the differences between custody under the JRA and under the DOC, and the reasons youthful offenders and adults are kept separate. Lyne testified that the JRA's goal is rehabilitation and that there is a stronger emphasis on rehabilitation in the JRA than under DOC. Different therapy options are available in the JRA, and there is an emphasis on maintaining youths' connections with family and their support systems.

Lyne further testified that youthful offenders cannot be housed with adult offenders because of "risk[s]" that include "[a]ge difference, brain development, [and] impulsivity." *Id.* at 219. Lyne further testified that "research of brain development" and "the differences between adults and juvenile offenders," including "mental health issues, impulsivity, cognitive abilities," showed that "our kids were not getting the services they needed at DOC." *Id.* at 220.

---

[5] Privilege status required a youth to not lose any "points" throughout the day, and if a youth can achieve privilege status for five days, they would be able to achieve honor status, the highest status. PRP App. B at 188.

5.   ARLENE SCOTT

Arlene Scott, a classification counselor for DOC, testified about where youthful offenders sentenced as adults are placed and the reasons they are kept separate from adult offenders.

She testified that offenders under 18 years old who have been convicted and charged as an adult "cannot be in sight or sound of adult offenders" so they are kept separate until they turn 18 and released into the community or they turn 21 and go to a DOC facility. *Id.* at 225. When young offenders are convicted before they turn 18, they are initially sent to a JRA facility where they can participate in the same programming as someone who was sentenced as a juvenile. But if the offender is convicted after they turn 18, as Smith likely would be, they go straight to a DOC adult facility.

Scott stated that although DOC has educational programs, vocational programs, family-oriented programs, school and college programs, and other programs, DOC does not have any programs that are specifically for young offenders.

When Smith asked Scott why young offenders should not be held with adult offenders, Scott stated that separation was required because studies had shown that young offenders' brains were "not as fully developed" and they lacked the maturity to make decisions or understand certain circumstances. *Id.* at 234. She also testified that she was aware of recent developments in the law addressing the fact that youthful offenders are different than adult offenders and that this must be considered at sentencing.

6.   SHELL MAYS

Shell Mays, a juvenile probation officer who had worked with Smith, testified about the declination report she had authored with the participation of a staffing committee. The declination

report outlined the factual basis for the charges being addressed at the declination hearing as described in the police report, described Smith's history, addressed the eight factors[6] that the juvenile court must weigh before declining jurisdiction, and concluded that Smith should be declined.

Mays testified that the committee had concluded that factor 1, weighed in favor of declination because the relevant charges were very serious acts. Regarding factor 2, the committee noted that Smith had "distributed power or control over HH, gave her several directives, dictated to [HH] how she should handle her business while he was incarcerated," threatened his ex-girlfriend in order to intimidate or control her, and carefully thought out and premeditated the assault. *Id.* at 252.

---

[6] These factors are known the *Kent* factors. *Kent v. United States*, 383 U.S. 541, 566-67, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). The eight *Kent* factors are:
> (1) "[T]he seriousness of the alleged offense and whether the protection of the community requires waiver;"
> (2) "[W]hether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;"
> (3) "[W]hether the alleged offense was against persons or against property;"
> (4) "[T]he prosecutive merit of the complaint;"
> (5) "[T]he desirability of trial and disposition of the entire offense in one court when the juvenile's accomplices in the alleged offense are adults;"
> (6) "[T]he juvenile's sophistication and maturity as determined by consideration of his or her home, environmental situation, emotional attitude, and pattern of living;"
> (7) "[T]he juvenile's record and previous history;" and
> (8) "[T]he prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile by the use of procedures, services, and facilities available in the juvenile court."

*State v. M.A.*, 106 Wn. App. 493, 498, 23 P.3d 508 (2001).

Regarding factor 6, the committee considered Smith's history and "felt that he is living an adult lifestyle" because he "spends several nights away from home," and "was coming and going as he pleased." *Id.* at 253.

Regarding factor 7, the committee recognized that Smith had a significant criminal history and that he had "been offered just about every service from the juvenile court" and that "the Court" did not think that he took advantage of these services. *Id.* at 254. Mays admitted that Smith had never had the opportunity to participate in the services provided by JRA, but she was unsure what additional services JRA could have provided. Mays believed the fact Smith had exhausted all services justified declining him.

Regarding factor 8, Mays testified that Smith's potential adult sentence would be more than twice the sentence he would potentially receive in juvenile court.

Mays testified that she had read Smith's file and was aware of his upbringing, including that both of his parents had been involved with drugs and that his father had been in and out of prison. Mays admitted that Smith had no control over those circumstances. When Smith asked Mays what "living an adult lifestyle" meant to her, she responded, "I believe he had been coming and going from his residence and that he didn't spend very many nights at home and was basically doing what he wanted to do in the community." *Id.* at 269-70. Mays also considered some of Smith's criminal behavior and "his behavior" to be indicative of "adult lifestyle." *Id.* at 270.

7.    LYNN AUSLEY

Lynn Ausley, Smith's father's former partner, testified for Smith. Ausley testified about Smith's difficult family life, his mother's ongoing drug use issues, his father's incarceration, his brother's drowning, and the lack of structure in his family life. She believed that Smith had done

12

well in Remann Hall because of the structure and reward system and opined that his home environment "was not a good environment." *Id.* at 296.

When Smith asked Ausley if she thought Smith would be different when he was 18 and whether he could make decisions as an adult, Ausley responded that she thought that Smith was "still in kid mode." and that she was "terrified" about what would happen if he was declined. *Id.* at 297. But she was "also terrified" about what would happen if he was released because he lacked support. *Id.*

B.     ARGUMENT

1.     STATE'S DECLINATION ARGUMENT

After the testimony, the State discussed the *Kent*[7] factors and argued that the juvenile court should decline Smith.

The State argued that Smith would be 18 in 60 days and that this weighed in favor of decline. It also argued that the second degree trafficking and commercial sex abuse of a minor charges were serious offenses and that this weighed in favor of decline.

The State further argued that Smith "does not care about his involvement of the victimization of HH," and that even if HH was willingly engaging in prostitution, Smith promoted, encouraged, and benefitted from it. *Id.* at 311. The State commented that Smith was "thumbing his nose at the system" by continuing to "pimp out [HH] using the jail phone system." *Id.* at 312.

During this argument, the State argued that Smith had "wreaked enough havoc on [the] community" because he had "been nothing but a criminal time after time after time," since the age of 13. *Id.* at 313. The State emphasized that Smith continued to commit offenses in a "never-ending

---

[7] *Kent*, 383 U.S. at 566-67.

cycle" despite being given access to resources and argued that, at this time, the court needed to focus on protecting the community over Smith's needs. *Id.* The State then commented that Smith had demonstrated that he was unable to act legally and commented that "everything . . . Smith does is illegal." *Id.* The State also emphasized that Smith had now been caught with a firearm twice and that the seriousness of the offenses made community protection paramount.

The State then argued that the second *Kent* factor, whether the offense was committed in an aggravated, violent, premeditative, or willful manner, also supported declination because Smith had demonstrated absolute power and control over HH. The State commented that "Smith ha[d] to be fairly savvy to commit these crimes," noting that "orchestrat[ing]" HH's dates took "a degree of sophistication," mental planning, and willfulness. *Id.* at 314.

The State further argued that even while Smith was in detention he continued "to engage in very serious behavior with assaults, contraband, manipulation of other inmates" and that this and his involvement with HH was "definitely not the work of somebody who lives a juvenile lifestyle and is unsophisticated or immature." *Id.* The State also argued that the fourth degree assault, in which Smith threw urine on the victim to distract the victim so he could hit him, was "one of the biggest indicators of Mr. Smith's attitude about the court system or the sanctity of other people's privacy." *Id.* at 315. The State also argued that the offenses in question were against persons, which supported declination.

The State further argued that Smith had demonstrated sophistication and maturity because there was "no doubt that [he] was living an adult lifestyle" as evidenced by the fact Smith was doing "what he wanted to do when he wanted to do it with whomever he wanted to do" it. *Id.* at 316. The State commented that the fact he was found in a motel room with a gun clearly

demonstrated that Smith was living an adult lifestyle. The State asserted that Smith had "an emotional attitude of an adult" and no respect for any type of authority. *Id.*

The State also argued that Smith had "engaged in every type of criminal behavior there is," including crimes that are usually only carried out by adults, and that "wherever he goes he's doing something illegal." *Id.* at 317, 318. The State then commented that it believed that Smith's "smarts come from the street." *Id.* at 318.

The State argued that the *Kent* factors, especially the safety of the community, justified an adult sentence because he would be released at 21 "with no services whatsoever." *Id.* at 319.

The State then drew the juvenile court's attention to the recently decided *Houston-Sconiers*[8] case. After the court responded that it was familiar with *Houston-Sconiers*, the State asserted that *Houston-Sconiers* required the adult court to consider the mitigating factors of youth, so even if the juvenile court declined jurisdiction those factors would still be examined at sentencing.

### 2    SMITH'S DECLINATION ARGUMENT

Smith began his argument by reminding the court that "kids are different" and should be treated differently, housed differently, and provided different services than adults. *Id.* at 320. Smith agreed that the trafficking offense was a serious offense because it is never "okay to send young women into forced sexual labor." *Id.* at 321. But he asserted that was not what had happened here because the evidence showed that he did not force HH to do anything or "cause her to prostitute." *Id.* Smith also argued that the facts related to the trafficking charge did not demonstrate that the public was endangered because no one was physically harmed by his actions. Smith further argued

---

[8] *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017).

that even if he benefitted from HH's prostitution, this was not a crime against a person because they were working together.

Additionally, Smith argued that he was "a kid doing kid stuff," there was no evidence he was particularly mature or any evidence he was living an adult lifestyle beyond the fact he came and went as he pleased. *Id.* at 329. He argued that this behavior was not "out of the norm for certain households in our community[,] [e]specially households where there is a lack of guidance and structure," such as Smith had experienced. *Id.* at 329-30. Smith then argued that the juvenile court should consider the information about Smith's "sad upbringing," and that he had not committed any "violent offenses" and that the longest time he had served prior to his current detention was 98 days. *Id.* at 330-31.

Smith further stated he had not received any "meaningful" time within the juvenile system that would be a deterrent to bad behavior. *Id.* at 331. He argued that in light of this, Smith should have the chance to be placed in the JRA.

Regarding the protection of public, Smith argued that the public would be protected because there was a likelihood of rehabilitation by allowing Smith to remain in the juvenile system and be rehabilitated.

C.    JUVENILE COURT'S WRITTEN RULING

On October 6, 2017, the juvenile court issued written findings related to each *Kent* factor and an order of remand to the adult superior court. The court provided a detailed description of the second degree trafficking, promoting commercial sexual abuse of a minor, felony harassment, and fourth degree assault offenses. The court also noted that Smith would turn 18 on November 24.

It then addressed each of the eight *Kent* factors and concluded that all but factor 5, which it determined was neutral, weighed in favor of declination. The court's findings are set out in more detail below.

## II. ANALYSIS

Smith contends that (1) the *Kent* factors "must be interpreted to incorporate recent caselaw grounded in brain science" and to presume a lack of maturity and sophistication as required under *Houston-Sconiers*, and the juvenile court failed to consider brain science or apply this presumption, PRP at 53; (2) "the decline hearing was affected by implicit racial bias and the court's decision to decline adopted the prosecutor's arguments which were 'factors that serve as proxies for race,' " *Id.* at 50 (quoting *In re Dependency of K.W.*, 199 Wn.2d 131, 161, 504 P.3d 207 (2022)); (3) several of the juvenile court's findings were not supported by substantial evidence or were improperly weighed; and (4) the legislature's 2018 amendments to former RCW 13.40.110 (2009), which removed certain offenses from the statute mandating or permitting a declination hearing, apply retroactively to him and this case must be remanded to juvenile court jurisdiction in light of these amendments.

In addition to its disagreement with each of Smith's contentions, the State initially argues that Smith waived his right to collaterally challenge the declination order. The State also argues that Smith cannot establish prejudice warranting relief.

We hold that Smith does not establish error and dismiss the issues related to the declination order.

A.     THE STATE'S PRELIMINARY ARGUMENTS

    1.     NO WAIVER

As an initial matter, the State argues that Smith's plea agreement waived any challenge to the declination order. We disagree.

A petitioner can waive their ability to bring a collateral attack if the petitioner's waiver is made knowingly, intelligently, and voluntarily. *In re Pers. Restraint of Amos*, 1 Wn. App. 2d 578, 592, 406 P.3d 707 (2017). The State has the burden of demonstrating that the waiver is knowing, voluntary, and intelligent. *Id.*

In his plea agreement, Smith stipulated that he was "giving up his right to *appeal* the trial court's decision in his decline hearing." CP at 45 (emphasis added). This stipulation did not state that Smith was waiving his right to collaterally challenge the declination order. Similarly, in the plea agreement Smith acknowledged only that his right to *appeal* a guilty finding and other pretrial motions was limited. And no limitation on Smith's ability to bring a collateral challenge was discussed in the plea colloquy.

Thus, we hold that the State has not demonstrated that Smith waived his right to collaterally challenge the declination order.[9]

---

[9] We note that the issue of whether Smith breached the plea agreement by bringing this PRP and the consequences of any such breach is not before this court.

2.      PREJUDICE

The State further contends that if we were to reverse the trial court's declination order, there is no meaningful remedy available to Smith because he cannot be tried in juvenile court due to his current age. Thus, the State asserts, Smith would still be subject to an adult sentence.[10]

But under the 2019 amendments discussed below, even if Smith were to receive another adult standard range sentence, he would be sent to the JRA until he reaches the age of 25 (he is now 23). *See* RCW 72.01.410. Accordingly, we cannot simply presume a lack of prejudice on this basis.

B.      *KENT FACTORS*

As described above, Smith raises several issues regarding the *Kent* factors.

1.      LEGAL PRINCIPLES

The juvenile court's decision to decline jurisdiction is discretionary and is subject to reversal only when it is manifestly unreasonable or based on clearly untenable grounds. *State v. M.A.*, 106 Wn. App. 493, 498, 23 P.3d 508 (2001). The juvenile court's factual findings will not be reversed if they are supported by substantial evidence. *Id.* "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

"The State has the burden of proving by a preponderance of the evidence that declining jurisdiction is in the best interest of the juvenile or the public." *State v. Quijas*, 12 Wn. App. 2d

---

[10] The State also notes that Smith's sentence could even be higher if the State recharges him with some of the original charges. But this argument is predicated on the State seeking a formal finding of breach of the plea agreement by Smith, coupled with the superior court ordering withdrawal of the guilty plea.

363, 369, 457 P.3d 1241 (2020). When determining whether to decline jurisdiction, the juvenile

court must consider eight factors, known as the *Kent* factors. *Id.*; *Kent*, 383 U.S. at 566-67.

The State need not prove all eight of these factors in order to justify declination. *M.A.*, 106

Wn. App. at 498. But the juvenile court's failure to give appropriate consideration to these factors

constitutes an abuse of discretion. *Id.* When determining the sufficiency of the juvenile court's

reasons for declination, "[t]his court examines the entire record." *State v. H.O.*, 119 Wn. App. 549,

556, 81 P.3d 883 (2003).

2.      ADOLESCENT BRAIN SCIENCE AND PRESUMPTION OF LACK OF MATURITY AND
        SOPHISTICATION

Smith argues that the *Kent* factors "must be interpreted to incorporate recent caselaw

grounded in brain science" and to presume a lack of maturity and sophistication as required under

the *Houston-Sconiers*.[11] PRP at 53.

*Houston-Sconiers* requires sentencing courts to consider several factors when sentencing

any juvenile in adult court including (1) the mitigating circumstances of youth, including the

juvenile's " 'immaturity, impetuosity, and failure to appreciate risks and consequences;' " (2) the

juvenile's environment and family circumstances, their participation in the crime, and the possible

effects of familial and peer pressure; (3) "how youth impacted any legal defense;" and (4) "any

---

[11] In his reply, Smith asserts that "*Houston-Sconiers* is a substantive new rule, and retroactive," so it must be applied to the *Kent* factors to ensure that juveniles receive fair treatment. Reply at 30. But *Houston-Sconiers* announced both a substantive rule and a procedural rule. *In re Pers. Restraint of Hinton*, 1 Wn.3d 317, 328-29, 525 P.3d 156 (2023). And Smith's argument implicates the procedural rule, namely the mechanism necessary to effectuate the substantive rule, which requires the sentencing courts to consider the mitigating qualities of youth before imposing a sentence on a defendant who committed a crime as a youth. *Id.* Additionally, to the extent *Houston-Sconiers* might apply here, there is no need for retroactive application because *Houston-Sconiers* was decided before Smith's declination hearing.

factors suggesting that the child might be successfully rehabilitated." 188 Wn.2d at 23 (quoting *Miller v. Alabama*, 567 U.S. 460, 477, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)).

The *Houston-Sconiers* factors are largely subsumed by *Kent* factors 1 and 2, which examine the nature of the juvenile's crime; *Kent* factor 6, which requires consideration of the juvenile's sophistication and maturity as determined by consideration of his or her home, environmental situation, emotional attitude, and pattern of living; and *Kent* factor 8, which requires consideration of the likelihood of reasonable rehabilitation of the juvenile under the resources available in the juvenile court. Smith argues that the *Houston-Sconiers* factors should be considered when the juvenile court evaluates the *Kent* factors and that *Houston-Sconiers* requires the juvenile court to consider the *Kent* factors in light of juvenile brain science and to presume a lack of maturity and sophistication.

To the extent Smith and Amici are arguing that this court should announce a new rule requiring the juvenile courts to consider juvenile brain science and to presume a lack of maturity and sophistication at every declination hearing, that argument fails because Smith cannot demonstrate prejudice based on a prospective rule.

To the extent Smith is arguing that *Houston-Sconiers* required the juvenile court to consider brain science and presume a lack of maturity and sophistication in his declination hearing, this argument fails because *Houston-Sconiers* (1) was decided on 8th Amendment grounds and "[t]here is no constitutional right to be tried in juvenile court,"[12] and (2) addresses the sentencing of juveniles, not the jurisdiction of the juvenile court. *Houston-Sconiers*, 188 Wn.2d at 9; *State v.*

---

[12] Although Smith briefly mentions the Washington Constitution when he asserts that review of the declination order is appropriate under RAP 16.4(c), he does not present any argument based on the Washington Constitution related to the declination issue.

21

*Watkins*, 191 Wn.2d 530, 536, 423 P.3d 830 (2018). Accordingly, Smith does not demonstrate that *Houston-Sconiers* required the juvenile court to consider adolescent brain science or presume a lack of maturity and sophistication at his declination hearing.[13, 14]

Accordingly, we hold that this argument fails.

Smith also argues that he is entitled to relief under RAP 16.4(c)(3), which provides that restraint can be unlawful if "[m]aterial facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction, sentence, or other order entered in a criminal proceeding or civil proceeding instituted by the state or local government." He contends that there are "[m]aterial facts concerning the decline hearing that have not been previously presented and heard which require vacation of the decline order." PRP at 10.

To demonstrate unlawful restraint under RAP 16.4(c)(3), Smith must show that the material facts were discovered since the hearing and that they could not have been discovered

---

[13] Even if the juvenile court was required to consider adolescent brain science and presume a lack of maturity and sophistication, Smith fails to meet his burden of establishing prejudice. With regard to adolescent brain science, the record shows that some evidence regarding adolescent brain development was presented through Lyne's and Scott's testimony and that Smith argued that children are different. There is nothing in the record suggesting that the juvenile court did not take this into consideration. The record also shows that the juvenile court was aware of *Houston-Sconiers*, and there is no reason to believe that the court was unaware of *Miller*, which had been filed five years before this declination hearing.

[14] Although the trial court lacks the authority to alter them, as we previously noted, the *Kent* factors incorporate the mitigating qualities of youth, and a prudent court would consider such mitigating factors when examining the established factors. We also echo our prior concerns about adultification discussed in *In re Personal Restraint of Miller*, 21 Wn. App. 2d 257, 265-66, 505 P.3d 585 (2022). As we stated in *Miller*, we acknowledge that studies have demonstrated that adultification may be detrimental to children of color at criminal sentencing hearings and may result in disproportionately harsh sentences. *Id.* at 266. Thus, it is imperative that trial courts conscientiously consider that adultification is real and can result in disproportionate outcomes for children of color in order to avoid biased outcomes.

before the hearing by the exercise of due diligence, and he fails to do so here. *In re Pers. Restraint of Sherwood*, 118 Wn. App. 267, 270-71, 76 P.3d 269 (2003). Smith does not identify any relevant facts that could not have been discovered before the declination hearing. And, to the extent he may also be arguing that *Houston-Sconiers* was unavailable to the juvenile court, that is not the case. *Houston-Sconiers* was decided in March 2017, six months before the September 2017 declination hearing, the parties alerted the juvenile court to the existence of *Houston-Sconiers* during the declination hearing, the juvenile court stated that it was aware of the case, and at least one witness referenced *Houston-Sconiers* in her testimony. Accordingly, this argument fails.

### 3. RACIAL BIAS

Smith next contends that the juvenile court did not apply the *Kent* factors in a race-conscious manner that accounts for the existence of implicit racial bias at his declination hearing.[15] He contends "that the *Kent* factors as applied in [his] case operated as race-based proxies because they invited adultification and underscored racial disparity." Reply at 31. Specifically, he contends *Kent* factors 1, 2, 3, and 8 operated "as race-based proxies" in his case.[16] PRP at 57.

Regarding the first *Kent* factor, the seriousness of the alleged offense and whether the protection of the community requires waiver, the juvenile court's finding described the offenses

---

[15] To the extent the Amici argue that we should consider this issue more broadly and determine whether the *Kent* factors result in disproportionate treatment of Black children because they incorporate adultification bias and harmful racial stereotypes and do not account for disproportionate law enforcement action against Blacks, we do not address those arguments because they exceed the scope of the issues raised by Smith. *State v. J.W.M.*, 1 Wn.3d 58, 74 n.4, 524 P.3d 596 (2023).

[16] In his reply, Smith also asserts that *Kent* factor 7 served as a race-based factor in his case. But Smith does not challenge factor 7 on this ground in his PRP, so we do not address this argument because it was raised for the first time in a reply brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

and concluded that this factor weighed in favor of declination. The court's finding emphasized that Smith had been charged with several serious offenses, including two class A felonies considered to be violent offenses, that the charged offenses either occurred or continued while he was in detention or on a suspended sentence, and that he had also possessed a firearm. The court further stated that the evidence showed that Smith had "actively promoted, encouraged, and profited from the victimization of a 15/16-year-old girl who engaged in prostitution for [his] benefit." CP at 192.

The court concluded,

> The seriousness of the offenses and the protection of the community requires declination. He has been given multiple offers and chances to take advantage of many services from the juvenile court. He was not interested or engaged in these services. Keonte Smith is almost 18 years old. He has exhausted the services of the juvenile system. This factor weighs in favor of declination.

*Id.* at 193. This finding is supported by the evidence presented at the declination hearing. And nothing in this finding suggests that the juvenile court relied on any impermissible race-based proxies when considering this factor.

Regarding the second *Kent* factor, which addresses whether the offense was committed in an aggravated, violent, premeditated, or willful manner, the juvenile court's finding stated, "[Smith's] action[ ] involve[d] a gun, violence, and direct and indirect control of a juvenile female into forced sexual activity for his financial gain. This factor weighs in favor of declination." *Id.* Although the evidence showed only that Smith was found with a gun around the time of the offenses involving HH and, as discussed below, there is no evidence that he forced HH to engage in sexual activity, the remainder of this finding is supported by the evidence presented at the declination hearing that demonstrated that Smith promoted HH's prostitution activities in a premeditated and willful manner, that Smith threatened his ex-girlfriend with violence, and that he

assaulted another youth in Remann Hall. And nothing in this finding suggests that the juvenile court relied on any impermissible race-based proxies when considering this factor.

Regarding the third *Kent* factor, whether the offenses were against persons, the juvenile court's finding stated, in its entirety, "The alleged offenses were committed against a 15-year-old female and involved forced sexual activity for [Smith's] financial gain. The threats made to [Smith's] ex-girlfriend involved an adult female. This factor supports declination." *Id.* As discussed below, the "forced sexual activity" portion of this finding is not supported by substantial evidence. But the remainder of this finding is supported by the evidence presented at the declination hearing, and nothing in this finding suggests that the juvenile court relied on any impermissible race-based proxies when considering this factor.

And regarding the eighth *Kent* factor, the prospects for adequate protection of the public versus the likelihood of rehabilitation in the juvenile system, the court's finding was more extensive. The court stated that Smith's "disrespect and disregard for the authority of his parents, teachers, and the Court system;" his refusal to take advantage of the resources offered to him; the fact he continued to reoffend while on juvenile probation; and the limited time he would be subject to juvenile court jurisdiction weighed in favor of declination. *Id.* at 194. It further stated that there was no reasonable likelihood of rehabilitation under the juvenile system and that "[o]nly the adult system can guarantee" community safety and provide adequate potential for rehabilitation of Smith. *Id.* at 195. The trial court also noted, citing *Houston Sconiers*, that "[t]he adult trial court will be required to consider youthful mitigating factors in any future sentencing determination." *Id.*

This finding is largely supported by the evidence presented at the declination hearing demonstrating that Smith's criminal behavior had escalated over time despite his several detentions and supervisions within the juvenile system and the fact that he was approaching the age of 18 and would not be detained for a significant period of time if he remained in the juvenile system. But, unlike the other challenged findings, the portion of this finding referring to "[Smith's] record of disrespect and disregard for the authority of his parents, teachers, and the Court system," *id.* at 194, could, in part, be construed as questionable in light of the significant evidence that Black youth are often characterized as being defiant and over-mature. This is of particular concern when considering the assertion that Smith was defiant of his parents when there was considerable evidence that his parents were often absent and/or engaged in drug use or abusive behavior. But it is unlikely that this single defect in an otherwise proper finding is prejudicial.

Accordingly, Smith does not demonstrate that the juvenile court failed to apply the majority of the *Kent* factors he challenges in a race-neutral manner. And the one potential error is harmless.

Smith also asserts that the juvenile court adopted the State's arguments that Smith's lack of parental guidance was evidence that he was " 'living an adult lifestyle,' " that his prior juvenile cases demonstrated that he was " 'nothing but a criminal,' " that he had " 'engaged in every [type] of criminal behavior there is,' " and that he had " 'the emotional attitude of an adult,' " "are classic race-based proxies and evidence of adultification bias."[17] Reply at 31-32 (quoting PRP App. B at 313, 316-17). The State's arguments are concerning because they can easily be construed as race-based proxies. But, apart from the court's conclusion that Smith was living an adult lifestyle, which

---

[17] In his reply, Smith incorrectly asserts that the quoted statements were the juvenile court's findings.

is addressed below, the juvenile court's findings do not reflect these arguments and it is conjecture that the juvenile court adopted these specific arguments.

Citing *State v. Quijas*, 12 Wn. App. 2d 363, 375, 457 P.3d 1241 (2020), Smith further argues that to prevent racial disproportionality in the decline process, the juvenile court had to specifically "examine how race may factor into the [c]ourt's decision making prior to transferring a child to adult court." PRP at 56. But *Quijas* does not require that the courts consider how race may factor into its decision-making process at every declination hearing—it addressed whether the court hearing Quijas' declination hearing erred when it failed to rule on Quijas' specific claim of racial bias made in his briefing to the juvenile court. 12 Wn. App. 2 at 365, 373-75. Rather than suggest that the juvenile court is always required to consider how race may factor into its decision, *Quijas* only requires the court address a claim of racial bias when such a claim is made. Because Smith did not raise any such issues at the declination hearing, *Quijas* is not helpful to him.

Smith argues that because *Quijas* and "the Evans report were not available"[18] to him before his decline hearing, this court should review this issue under RAP 16.4(c)(3). PRP at 61. But for RAP 16.4(c)(3) to apply, Smith must show that material facts could not have been discovered before the hearing by exercise of due diligence, and he fails to make that showing here. *Sherwood*, 118 Wn. App. at 270-71. Although the Evans Report was not available until 2021, it relied on

---

[18] The "Evans Report" is a University of Washington report that was commissioned by the Skagit County Public Defender's Office and was based on data provided by the Administrative Office of the Courts. PRP App. G (HEATHER D. EVANS & STEVEN HERBERT, UNIV. OF WASH. JUVENILES SENTENCED AS ADULTS IN WASHINGTON STATE, 2009-2019, (Evans Report) [https://perma.cc/LN87-4WN8]). The report discusses the disparate treatment of Black youth in the Washington criminal justice system and concludes that children of color "are disproportionately over-represented among youth convictions, discretionary decline, and auto decline cases." Evans Report at 4.

numerous articles and studies that existed well before 2017, so Smith cannot claim that issues of racial bias, implicit or explicit, were not known prior to his declination hearing. *See, e.g.*, Evans Report at 1 n.1, 3, 4. And, as discussed above, *Quijas* does not assist Smith, nor is an appellate case a "material fact."

Smith fails to demonstrate that the juvenile court did not apply the *Kent* factors in a race-neutral manner.

4.      SMITH'S ADDITIONAL CHALLENGES TO SEVERAL *KENT* FACTOR FINDINGS

Smith also specifically challenges the juvenile court's findings on *Kent* factors 1, 2, 4, 5, 6, and 7.

a.      FACTOR 1

Regarding *Kent* factor 1, the seriousness of the alleged offense and whether the protection of the community requires waiver, Smith argues that the juvenile court erred by focusing on the seriousness of the crime. He contends that the seriousness of the crime does not necessitate decline to adult court and that the court's focus on the seriousness of the crime was improper because research shows that even juveniles who commit serious offenses can be rehabilitated.

But the seriousness of the crime is just one factor that the juvenile court considered. Smith's concern that by considering this factor the juvenile court failed to consider his individual circumstances and potential for rehabilitation is unfounded because the court's findings demonstrate that it considered other factors that account for his individual circumstances and potential for rehabilitation. For instance, the court addressed factor 6, which addressed Smith's sophistication and maturity, and factor 8, which addressed his likelihood of rehabilitation.

b.      FACTOR 2

Smith also argues that the juvenile court's findings on *Kent* factor 2 is not supported by

substantial evidence.[19]

This factor addresses whether the alleged offense was committed in an aggressive, violent,

premeditated or willful manner. The juvenile court's finding on *Kent* factor 2 stated that "[Smith's]

actions involve a gun, violence, and direct and indirect control of a juvenile female into forced

sexual activity for his financial gain." CP at 193.

Smith argues that the evidence did not establish that he used force or intimidation with

regard to prostituting HH. Smith is correct that there is no evidence that he *forced* HH to engage

in sexual activity. But the record supports the conclusion that Smith acted with premeditation and

willfulness when he facilitated and directed HH's prostitution activities. And that supports this

finding. The record also supports a finding that the assault and likely the harassment, which Smith

does not discuss, were aggressive, violent, premeditated, or willful.

c.      FACTOR 4

Smith next challenges the juvenile court's finding on *Kent* factor 4. This factor addresses

the prosecutive merits of the complaint.

The juvenile court found,

> Prosecutive merit is established when there is evidence upon which a grand
> jury may be expected to return an indictment. In Washington, this burden is
> established when there is probable cause to believe a person is guilty of a criminal
> offense.
> In the present case, there is prosecutive merit. Much of the evidence against
> [Smith] includes direct quotes from either text messages between Mr. Smith and

---

[19] Smith also refers to the finding on *Kent* factor 3, but he does not provide any argument regarding
the sufficiency of factor 3.

the juvenile victim or recorded phone calls between the two. This factor supports declination.

*Id.*

The juvenile court's finding can be read as inferring that the evidence from the conversations between Smith and HH is sufficient to establish probable cause. And a review of the facts related to each charge demonstrates probable cause, which is all that is required under *Kent*. 383 U.S. at 567 (prosecutive merit of the complaint addresses "whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).").

### d.     FACTOR 5

Smith also challenges *Kent* factor 5. This factor requires the juvenile court to consider whether it is desirable to try and dispose of the entire offense in one court when the juvenile's accomplices in the alleged offense are adults. The juvenile court found that this factor was "neutral." CP at 193. Smith argues that this factor weighs against declination because he had no adult accomplices. He cites no authority in support of this argument. The trial court did not err in finding this factor neutral because the lack of any codefendants makes this factor irrelevant.

### e.     FACTOR 6

Smith also challenges the juvenile court's finding on *Kent* factor 6. Factor 6 requires the court to consider "the juvenile's sophistication and maturity as determined by consideration of his or her home, environmental situation, emotional attitude, and pattern of living." *M.A.*, 106 Wn. App. at 497-98.

Smith argues that the juvenile court's finding on *Kent* factor 6 is improper because "the court erred by not considering the body of scientific evidence regarding juvenile brain

development and the effect of incomplete brain development on culpability." PRP at 66. This appears to be a reiteration of the argument above that the court should have considered adolescent brain science, so we do not address this issue separately.

Smith also argues that this finding is not supported by substantial evidence because "the court completely ignored the wealth of mitigating evidence, not acknowledging any of the testimony it heard about [Smith's] deplorable upbringing, dysfunctional home life, death of his brother just prior to him becoming involved the juvenile justice system, and childhood trauma." *Id.* He also asserts that the court erred in finding that he was living an adult lifestyle because he did not reside with his mother.

Smith is correct that the trial court did not mention, in this finding, the evidence it heard about Smith's upbringing, home life, and childhood trauma. However, even if this finding is questionable, Smith does not show prejudice from the juvenile court's decision to decline jurisdiction based solely on the juvenile court's characterization of this factor as weighing in favor of decline. As we note above, the juvenile court is not required to find each factor in order for declination to be upheld. *M.A.*, 106 Wn. App. at 498.

f.    FACTOR 7

Smith also challenges a portion of the juvenile court's finding on *Kent* factor 7. Factor 7 requires the juvenile court to consider Smith's record and prior history. *Id.*

Smith, however, does not challenge the juvenile court's characterization of his record and prior history. Instead, he argues that the portion of the court's finding stating that he " 'appears to be outside the realm of being a suitable candidate for the juvenile rehabilitation institution,' " is not supported by substantial evidence because, prior to his detention for the current charges, he

had only served 98 days in a juvenile facility and had never been sentenced to the JRA. PRP at 67 (quoting PRP App. A at 11). He implies that he has never had the opportunity to participate in the rehabilitative programs available only in the JRA, so the court erred by considering him not to be a candidate for rehabilitation.

Although other services might have been available if Smith had been sent to the JRA, there was no evidence regarding those services or how they differed from the services available in Remann Hall or while Smith was under supervision. Smith's longest physical detention prior to his detention for the current crimes may have only been 98 days, but it was not his only detention and he was either in detention or under supervision from the time he was 13 years old and did not appear to respond to the sanctions or treatments provided. Given Smith's considerable history and the fact he continued to commit offenses despite repeated detentions and services supports this finding.

C.      AMENDMENTS TO FORMER RCW 13.40.110 (2009)

Smith next argues that the 2018 amendments to former RCW 13.40.110 (2009), which removed second degree trafficking and commercial sexual abuse of a minor from the list of offenses that could permit decline of a juvenile to adult court, operate retroactively and apply to him. Because the legislature did not provide for retroactive application of the amendments and Smith fails to show that the amendments are curative or remedial, we hold that the amendments apply prospectively.

1.      LEGAL PRINCIPLES

"We review de novo the applicability of an amended statute." *Soushek v. Dep't of Licensing*, 1 Wn. App. 2d 352, 357, 405 P.3d 209 (2017). An amendment to a statute is presumed

to apply prospectively unless the legislature specifically provides for retroactive application or the amendment is curative or remedial. *In re Pers. Restraint of Flint*, 174 Wn.2d 539, 546, 277 P.3d 657 (2012). The presumption that an amendment applies prospectively can be supported by the legislature's use of present and future tenses in the wording. *Johnston v. Beneficial Mgmt. Corp. of Am.*, 85 Wn.2d 637, 641-42, 538 P.2d 510 (1975).

"A curative amendment clarifies or makes a technical correction to an ambiguous statute." *Flint*, 174 Wn.2d at 546. "A remedial change relates to practices, procedures, or remedies without affecting substantive or vested rights." *Id.* Remedial statutes generally "afford a remedy, or better or forward remedies already existing for the enforcement of rights and the redress of injuries." *Haddenham v. State*, 87 Wn.2d 145, 148, 550 P.2d 9 (1976). A "right" is defined as "a 'legal consequence deriving from certain facts, while a 'remedy' is a procedure prescribed by law to enforce a right.' " *State v. McClendon*, 131 Wn.2d 853, 861, 935 P.2d 1334 (1997) (quoting *Dep't of Ret. Sys. v. Kralman*, 73 Wn. App. 25, 33, 867 P.2d 643 (1994)).

2.      RCW 13.40.110 AMENDMENTS

At the time of Smith's declination hearing, former RCW 13.40.110 (2009) provided, in part:

> (1) Discretionary decline hearing — The prosecutor, respondent, or the court on its own motion may, before a hearing on the information on its merits, file a motion requesting the court to transfer the respondent for adult criminal prosecution and the matter shall be set for a hearing on the question of declining jurisdiction.
> (2) Mandatory decline hearing — Unless waived by the court, the parties, and their counsel, a decline hearing shall be held when:
> (a) The respondent is sixteen or seventeen years of age and the information alleges a class A felony or an attempt, solicitation, or conspiracy to commit a class A felony;
> (b) The respondent is seventeen years of age and the information alleges assault in the second degree, extortion in the first degree, indecent liberties, child

molestation in the second degree, kidnapping in the second degree, or robbery in the second degree; or
(c) The information alleges an escape by the respondent and the respondent is serving a minimum juvenile sentence to age twenty-one.

Under former RCW 13.40.110 (2009), a declination hearing based on second degree trafficking charge was mandatory and a declination hearing based on commercial sexual abuse of a minor charge was discretionary.

In 2018, effective June 7, 2018, the legislature removed former RCW 13.40.110 (2)(a) and (b) (2009). LAWS OF 2018, ch. 162, § 4. This left former subsection (c) as the only basis for a mandatory declination hearing. *Id.* The legislature also limited discretionary declination hearings to certain respondents charged with serious violent offenses or with first or second degree murder. *Id.* Under the now former RCW 13.40.110 (2018), none of Smith's charged offenses were subject to a declination hearing.

In 2019, the legislature further amended RCW 13.40.110 to include certain respondents charged with custodial assault to the list of offenses subject to discretionary declination hearings. LAWS OF 2019, ch. 322, § 10. The amendments to the statute made in 2018, that Smith now relies on, remained despite the further amendments to the statute in 2019.

3.    NOT RETROACTIVE

Under former RCW 13.40.110 (2018), none of Smith's offenses would have qualified for a decline hearing, and his case would have remained in juvenile court. Smith argues that the 2018 amendments should apply to him and that this matter should be remanded back to the juvenile court, where he would be entitled to a shorter sentence and face a maximum term of incarceration to age 21. But Smith fails to demonstrate that the 2018 amendments were retroactive.

Nothing in the 2018 legislation expressly provides for retroactive application. LAWS OF 2018, ch. 162. Additionally, the legislature's use of the present and future tense in the amendments further demonstrates that the legislature intended the amendment to apply prospectively. *Johnston*, 85 Wn.2d at 641-42.

For instance, the legislation provided: "AN ACT Relating to revising conditions under which a person *is* subject to exclusive adult jurisdiction and *extending* juvenile court jurisdiction over serious cases to age twenty-five." LAWS OF 2018, ch. 162 (emphasis added). And the amended statute is couched entirely in present and future terms. For instance, it provides "the matter *shall be* set for a hearing on the question of declining jurisdiction," and "[t]he respondent *is*, at the time of the proceedings, at least fifteen years of age . . . ." Former RCW 13.40.110(1)(a) (2018) (emphasis added). Nothing in this language suggests anything but prospective application. The 2018 amendments are also not curative because they do not purport to clarify or correct any ambiguity.

Nor are the 2018 amendments remedial because they narrowed the scope of juvenile offenders who can be declined and charged in adult court, which relates to the juvenile court's jurisdiction rather than any practice, procedure, or remedy. *See Watkins*, 191 Wn.2d at 533 n.1 (addressing the same 2018 bill's amendments to former RCW 13.04.030 (2009), the former automatic decline statute).

Smith does not overcome the presumption of prospective application because he does not show that the legislature specifically provided for retroactive application or that the amendments are curative or remedial. *Flint*, 174 Wn.2d at 546. Accordingly, we hold that Smith fails to demonstrate that the 2018 amendments to former RCW 13.40.110 (2009) apply retroactively.

### III.    CONCLUSION ON DECLINATION ISSUES

We hold that Smith's challenges to the declination order fail and deny his PRP as to these claims.

### SENTENCING ISSUES

Smith raises several arguments related to the sentencing court's refusal to impose an exceptional sentence downward. We include additional facts from the record where applicable to these arguments. We hold that these arguments fail.[20]

Prior to sentencing, Smith submitted a sentencing memorandum asking the trial court to impose an exceptional sentence downward along with numerous supporting documents. Smith's counsel requested an exceptional sentence downward of 36 months. Counsel referred the sentencing court to Smith's sentencing memorandum and the supporting materials included with

---

[20] As an initial matter, the State asserts that Smith cannot challenge his standard range sentence because "disagreement with how the court exercised its discretion in denying a request for an exceptional sentence is not a proper basis to challenge a standard range sentence." Response at 17. But the rule that a defendant cannot challenge a standard range sentence does not apply to the procedure by which a standard range sentence is imposed. To the extent Smith is challenging the sentencing court's procedure in determining that an exceptional sentence was not warranted, we can address his sentencing issues. *State v. Stewart*, 27 Wn. App. 2d 441, 448-49, 532 P.3d 211 (2023).

The State also argues that Smith waived his right to challenge his sentence because he stipulated in his plea agreement that only certain sentencing issues could be raised on appeal. But this stipulation applies only to appeals, not to collateral attacks such as this PRP.

Additionally, the State argues that this PRP should be dismissed as frivolous because Smith has not identified any error at sentencing or established how any alleged sentencing error prejudiced him. But, as demonstrated below, not all of his claims are frivolous. And if Smith can demonstrate that the sentencing court erred, Smith could demonstrate prejudice because the court would need to reconsider its sentencing decision in light of the error and, because Smith was sentenced to the lowest standard range sentence possible, it is more likely than not he would receive a more favorable sentence.

the memorandum, including a forensic assessment by Dr. Ronald Roesch, a clinical psychologist. The sentencing court acknowledged that it had reviewed all of these materials.

Counsel's argument supporting the request for the exceptional sentence downward emphasized Smith's age, his lack of maturity, his "deplorable upbringing," "the lack of guidance he received," and Roesch's report. Verbatim Rep. of Proc. (Aug. 2, 2018) at 8. Counsel also referred to *Houston-Sconiers* and discussed brain science issues. And she asserted that although the current offense was considered a violent offense, there was "no injury to anyone, no gun used, no force, no coercion alleged in this case." *Id.* at 14-15.

Additionally, counsel noted that although Smith had spent some time at Remann Hall, he had never been sentenced to the JRA, which was rare when a juvenile has been declined. Counsel also emphasized that the juvenile court's statements in its declination order acknowledged that the adult court would have to consider Smith's youth-related mitigating circumstances. Counsel asserted that this meant that the juvenile court had declined Smith in part because it anticipated that the sentencing court "would be giving him an exceptional sentence underneath the standard range." *Id.* at 18.

During the sentencing presentation, Smith's counsel referred the sentencing court to the probable cause statement. Counsel stated, "I want to talk just a minute about the circumstances of the offense, and I explained . . . what the certificate of probable cause detailed. I would ask the Court to consider that." *Id.* at 15.

A.      CONSIDERATION OF THE 2016 POSSESSION OF A FIREARM

Smith first argues that the sentencing court's refusal to grant his request for an exceptional sentence downward was error because the court relied on the 2016 unlawful possession of a firearm

charge that was "dismissed and unproven." PRP at 11. He contends that the sentencing court's reliance on this charge violated the real facts doctrine, RCW 9.94A.530(2).[21] We hold that this argument fails because Smith acknowledged that he possessed a firearm in 2016.

RCW 9.94A.530(2) provides in part:

> In determining any sentence other than a sentence above the standard range, the trial court may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing, . . . Where the defendant disputes material facts, the court must either not consider the fact or grant an evidentiary hearing on the point. The facts shall be deemed proved at the hearing by a preponderance of the evidence.

The real facts doctrine "requires [that a] sentence be based on the defendant's current conviction, his criminal history, and the circumstances surrounding the crime." *State v. Randoll*, 111 Wn. App. 578, 582, 45 P.3d 1137 (2002). "Real facts" are those facts that the State has proved or that the defendant has affirmatively admitted. RCW 9.94A.530(2); *State v. Hunley*, 175 Wn.2d 901, 917, 287 P.3d 584 (2012). "The purpose of this limitation is 'to protect against the possibility that a defendant's due process rights will be infringed upon by the sentencing judge's reliance on false information.' " *Hunley*, 175 Wn.2d at 909 (quoting *State v. Herzog*, 112 Wn.2d 419, 431-32, 771 P.2d 739 (1989).

Smith contends that the sentencing court erred by relying on the dismissed unlawful possession of a firearm *charge* and that the court "essentially sentenced [him] for a crime for which he was never convicted." PRP at 11. Although the sentencing court referred to the 2016 unlawful

---

[21] In 2023, the legislature amended former RCW 9.94A.530(2) (2008), the version of the statute in effect at the time of Smith's sentencing. LAWS OF 2023, ch. 102, § 15. This amendment removed a portion of the statute that our supreme court held was unconstitutional in *State v. Hunley*, 175 Wn.2d 901, 917-18, 287 P.3d 584 (2012). Because the unconstitutional portion of former RCW 9.94A.530(2) would not have applied in 2018, we cite to the corrected version of the statute.

possession of a firearm charge, its focus was on the fact Smith possessed a firearm in 2016 despite having previously been adjudicated guilty of unlawful possession of a firearm, not the fact he had been *charged* with a second unlawful possession of a firearm offense. Accordingly, our focus is on whether it had been established, as a factual matter at sentencing, that Smith possessed the firearm in 2016.

As the State notes, Smith did not object to the court's consideration of his 2016 firearm possession at sentencing. Our supreme court has held that if a defendant fails to object to information proffered at sentencing, the information is "deemed acknowledged for purposes of the sentencing judge's consideration." *State v. Handley*, 115 Wn.2d 275, 282, 796 P.2d 1266 (1990). Accordingly, because Smith did not object, he is deemed to have acknowledged the fact he possessed the firearm, and we hold that this argument fails.[22]

Furthermore, even without deeming this fact as acknowledged, we hold that Smith acknowledged at sentencing that he possessed the firearm in 2016 by presenting this fact himself.

The probable cause statement stated that in November 2016, law enforcement discovered Smith in a motel room with a handgun and that this resulted in his being booked into Remann Hall, where he then made the phone calls that ultimately led to the second degree trafficking charge. Smith argues that the sentencing court could not rely on the probable cause statement for the fact he had possessed this firearm because he did not agree to allow the court to rely on the probable cause statement in his plea agreement and his factual statement did not admit to possession of a firearm.

---

[22] The State couches its argument in terms of waiver, but *Handley* did not state that waiver occurs when a defendant fails to object to a fact at sentencing. Rather, it merely says that the information is deemed acknowledged. 115 Wn.2d at 282.

Smith is correct that his plea agreement did not permit the court to rely on the probable cause statement to determine whether there was a factual basis for his guilty plea and that he did not mention a firearm in his plea statement. But nothing in the plea agreement precluded the sentencing court from considering the probable cause statement for purposes other than determining the factual basis for the plea.

Furthermore, the sentencing court was entitled to consider the probable cause statement because Smith's counsel referred the court to it for a description of the "circumstances surrounding the offense" in both Smith's sentencing memorandum and at the sentencing hearing. CP 58 (capitalization omitted). Because Smith directed the court to the probable cause statement Smith acknowledged the fact he possessed a firearm in 2016, and this fact was properly before the sentencing court. Accordingly, we hold that the sentencing court did not err when it relied on Smith's 2016 possession of a firearm when determining Smith's sentence.

B.    WEIGHING MITIGATING AND AGGRAVATING FACTORS AND LACK OF DETAILED DISCUSSION OF *HOUSTON-SCONIERS* FACTORS

Smith argues that the sentencing court erred because it did not give more weight to the mitigating factors of youth than to retributive factors.[23] He argues that our supreme court's decisions in *State v. Delbosque*, 195 Wn.2d 106, 456 P.3d 806 (2020) and *State v. Haag*, 198

---

[23] The State contends that this issue was raised and addressed on direct appeal. Although this issue is similar, we hold that it is not the same.

In his direct appeal, Smith argued that "the trial court did not meaningfully consider his request for an exceptional sentence." *Smith*, No. 52323-0-II, slip op. at 6. But Smith did not argue in his appeal that the sentencing court was required to give greater weight to the mitigating factors. Although Smith asserts that under this requirement the sentencing court failed to give meaningful consideration to the mitigating factors, he raises the distinct legal argument regarding what weight the sentencing court was required to accord the mitigating factors that we have not yet addressed. Accordingly, we address this issue.

Wn.2d 309, 495 P.3d 241 (2021) demonstrate that the court was required to place more emphasis on mitigating factors and that the court's failure to specifically discuss any of the mitigating factors shows it failed to accord them the appropriate weight and that substantial evidence does not support the court's "findings." PRP at 20.

In *Delbosque*, our supreme court did not address the weight that the sentencing court must give the mitigating factors. It merely held that the court must give meaningful consideration to them. 195 Wn.2d at 120. So our supreme court's *Delbosque* decision does not establish that the court was required to give the mitigating factors greater weight.

In *Haag*, our supreme court held "that in a *Miller*-fix hearing conducted under RCW 10.95.030, retributive factors must count for less than mitigating factors." *Haag*, 198 Wn.2d at 325. But *Haag* addressed the weight of the mitigating factors in the context of a *Miller*-fix hearing under former RCW 10.95.030(3) (2015)[24] and RCW 10.95.035, which address the resentencing of a juvenile who had already received and served part of a life without the possibility of parole sentence.[25] *Id.* at 313-14.

Smith argues that "because the mitigating factors of youth considered under *Miller* and under *Houston-Sconiers* are the same, [the cases addressing *Miller*-fix resentencings] and their underlying principles are still applicable in the context of sentencing for a juvenile under the [sentencing reform act of 1981 (SRA)]." PRP at 13-14. But this argument ignores the fact that,

---

[24] Now RCW 10.95.030(2). LAWS OF 2023 ch. 102, § 20.

[25] We note that the State relies on *State v. Backstrom*, for the premise that the trial courts conducting *Miller* hearings " 'have considerable discretion to weigh the mitigating factors of youth when sentencing a defendant convicted of crimes committed as a juvenile.' " Response at 23 (emphasis omitted) (quoting 15 Wn. App. 2d 103, 104, 476 P.3d 201 (2020)). The State fails to acknowledge that *Backstrom* was decided before *Haag*.

unlike here, *Miller*-fix resentencings have specific statutory requirements, that they require the resentencing courts to consider evidence of rehabilitation that occurred during the portion of the sentence already served, and that they address actual or de facto life without the possibility of parole sentences that have already been determined to be unconstitutional when applied to juveniles. *Haag*, 198 Wn.2d at 322; *State v. Ramos*, 187 Wn.2d 420, 442-43, 387 P.3d 650 (2017). *Miller*-fix hearings are "not ordinary sentencing proceedings." *Ramos*, 187 Wn.2d at 443. And *Miller*-fix cases do not address the weight that must be accorded the mitigating factors of youth at an initial sentencing hearing. Furthermore, Smith does not cite to any case in which this weight requirement has been applied outside of the context of a *Miller*-fix resentencing.

Because Smith does not demonstrate that the requirement that the sentencing court give more weight to the mitigating factors of youth applies outside the *Miller*-fix context, this argument fails.

Smith next argues that the sentencing court's failure to discuss each of the *Houston-Sconiers* factors on the record and to provide reasoning supporting its findings prevents us from determining whether the court meaningfully considered Smith's youth.[26] We hold that we addressed this issue on direct appeal. *Smith*, No. 52323-0-II, slip op. at 9-13.

Although Smith correctly points out that the dissent in his appeal disagreed, the majority necessarily found the record sufficient to determine whether the sentencing court had meaningfully considered Smith's youth because it was able to address the issue. *Compare id*. at 12-13, *with id*. at 17 (Glasgow, J., dissenting) ("This lack of discussion leaves this court unable to determine

---

[26] Amici also assert that the record of the sentencing hearing is insufficient to permit review of whether his race contributed to his sentence. This argument exceeds the scope of Smith's sentencing arguments, so we do not address it.

whether the *Houston-Sconiers* factors were *meaningfully* considered."). Because we already concluded the sentencing court's oral ruling was sufficient to determine that it had meaningfully considered Smith's youth, this issue has been raised and addressed on appeal, and we do not consider this issue.[27]

C.      PRESUMPTION OF MITIGATION

Smith next argues that under article I, section 14 of the state constitution, juveniles are entitled to a presumption of a mitigated sentence when sentenced in adult court in order to ensure that they receive the heightened protections announced in *Houston-Sconiers*.[28] We reject Smith's article I, section 14 claim because Smith fails to present reasoned argument supporting this claim.

Smith provides an extensive *Gunwall*[29] analysis in an attempt to establish that article I, section 14 provides greater protection than its federal counterpart. But even if we were to hold that article I, section 14 provides greater protection in this context, that would only resolve the question of whether we should undertake an independent state constitutional analysis; it would not resolve the issue of whether the lack of a presumption of mitigation in fact violates article I, section 14's prohibition against cruel punishment. *See, e.g.*, *State v. Bassett*, 192 Wn.2d 67, 83, 428 P.3d 343

---

[27] To the extent Smith is also arguing that the trial court should have been required to enter written findings of fact and conclusions of law regarding each *Houston-Sconiers* factor at sentencing, this argument fails. Smith relies on RCW 13.40.110(3), *Ramos*, 187 Wn.2d at 444, and *State v. Rogers*, 17 Wn. App. 2d 466, 487 P.3d 177 (2021). But these authorities address the requirement that the court enter written findings of fact and conclusions of law in decline hearings, in *Miller*-fix hearings, and when imposing an exceptional sentence, not when sentencing a defendant to a standard range sentence.

[28] Amici joins in this argument.

[29] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

(2018) (discussing the application of the categorical bar analysis after determining that article I, section 14 provides greater protection than the Eighth Amendment).

Smith does not address what test we must apply to determine whether the lack of a presumption of mitigation violates article I, section 14. He merely asserts, without citation to any binding authority, that to ensure compliance with *Houston-Sconiers* a presumption that the juvenile is entitled to a mitigated sentence is required.[30] And he does not discuss why such a presumption is necessary when the sentencing court already has complete discretion to sentence a juvenile offender outside of the standard range set under the SRA. *Houston-Sconiers*, 188 Wn.2d at 21. This lack of reasoned analysis precludes consideration of this claim. *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) ("Parties raising constitutional issues must present considered arguments to this court.").

D.    ADDITIONAL REASONING BY SENTENCING COURT IN DECLINING TO IMPOSE AN EXCEPTIONAL SENTENCE

Smith challenges additional reasons the sentencing court gave in deciding not to impose an exceptional sentence below the standard range. These include the court's focus on the youth of HH, the victim of the crime, and its consideration of the plea bargain Smith entered into with the State.[31] However, Smith cites no authority for his assertion that a trial court cannot rely on these

---

[30] At best, Smith cites to J. González' dissent in *State v. Gregg*, 196 Wn.2d 473, 489-90, 474 P.3d 539 (2020) (González, J., dissenting).

concerns in the course of its consideration and rejection of a juvenile respondent's request for an exceptional sentence. Had the sentencing court refused to consider Smith's request for a downward departure, our analysis would be different. *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017). Here, however, the trial court thoroughly considered Smith's request and exercised its discretion not to impose a downward departure. In the absence of any showing that the trial court abused its discretion in its consideration of the parties' sentencing arguments or otherwise committed an error of law in considering these facts, these arguments fail. *Id.*

CONCLUSION

We deny this PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

---

[31] Smith also argues that the sentencing court improperly relied on a "finding" that his criminal behavior had "escalat[ed]." PRP at 20-21. Smith's argument relies on the characterization of the sentencing court's decision in the dissent in his direct appeal. But we disagree with the dissent's characterization of the record. Although the sentencing court mentioned the State's argument regarding the increasing seriousness of Smith's crimes, it did so when discussing Smith's ability to understand the illegality of his behavior, and nothing in the record suggests that the sentencing court considered any escalating behavior or increase in the seriousness of Smith's crimes when imposing sentence.

No. 56917-5-II

CRUSER, A.C.J.

We concur:

LEE, J

PRICE, J

46